UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| UNITED STATES OF AMERICA, | ) | Case No. 5:15CV02600 |
| --- | --- | --- |
| | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | **BENCH TRIAL OPINION** |
| | ) | |
| $84,367 IN U.S. CURRENCY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**I.     PROCEDURAL BACKGROUND**

The government filed a complaint for forfeiture *in rem* on December 15, 2015, stating that, on August 1, 2015, $84,367 in United States currency ("the defendant currency") was seized pursuant to a federal search warrant executed at the residence of James E. Golden ("Golden") and Tiffany Motley-Golden ("Motley") (collectively, "claimants"), 544 Douglas Street, Akron, Ohio. (Doc. # 1.) Golden and Motley filed separate answers and claims to the seized money, arguing that they are the rightful owners of the defendant currency and that it constitutes earnings from lawful employment and rental properties. (Doc. #s 4, 5, 10, 11, 12.) The Court set this matter for a bench trial. (Doc. # 33.) Following a two-day bench trial, the parties submitted post-trial briefs and proposed findings of fact and conclusions of law. (Doc. #s 51, 52, 53, 54.) Accordingly, this matter is ready for decision.

1

## II. FINDINGS OF FACT

The Court makes the following findings of fact as required under Federal Rule of Civil Procedure 52(a). The Court's findings of fact are based upon the testimony and exhibits received at trial, and upon the record in this matter. To the extent that the findings of fact contain conclusions of law, the conclusions of law shall be regarded as such.

1. On August 1, 2015, Anthony Mathews ("Mathews") purchased two ounces of cocaine from claimant Golden for $2,400 cash. The drug deal occurred at Golden's home located at 544 Douglas Street, Akron, Ohio. (Testimony of Mathews with corroboration by pole camera as testified to by Special Agent ("SA") Dan Werhmeyer.)

2. Mathews currently is serving a five-year prison term for possessing 108.86 grams of cocaine he admitted he had in his possession on August 1, 2015. The cocaine included two ounces he had purchased from Golden on August 1, 2015, and an additional two ounces he had purchased from Golden for $2,400 cash at Golden's residence the previous week. (Testimony of Mathews; Government Exhibit ("GVX") 1.)

3. Mathews had purchased at least five kilograms of cocaine from Golden between 2010 and August 1, 2015, usually in two-ounce quantities. Golden is his regular source of supply for cocaine, which is readily available most times of year and sold to Mathews always at Golden's house on Douglas Street, or at Golden's previous home on Glendora Avenue in Akron, Ohio. (Testimony of Mathews.) These facts were corroborated by the testimony of SA Werhmeyer, who observed Mathews visiting the Douglas Street home on numerous occasions by pole camera. (GVX 36.)

4. Notwithstanding claimants' argument that Mathews' testimony lacks any credibility because he would receive early release in exchange for cooperation with the government, the Court finds Mathews' testimony to be more credible than not.

5. Officers of the Akron/Summit County High Intensity Drug Trafficking Area ("HIDTA") Initiative and Safe Streets Task Force executed a federal search warrant at 544 Douglas Street, Akron, Ohio, the residence of Golden and Motley, on August 1, 2015. Golden lives at the home with his wife, Motley, and their three minor children. Both Golden and Motley were present at the search. No cocaine was located during the search. However, a large quantity of cash, the defendant currency, was found scattered throughout the house together with marijuana, a loaded Taurus semi-automatic pistol, and a money counter. Specifically, the following amounts were found: (1) $12,890 was discovered in a large wad in the pocket of a heavy construction or hunting coat hanging in the stairwell leading to the basement; (2) $14,740 was found in piles in an upper kitchen cabinet together with a portion of the marijuana found in the home; (3) $17,760 was recovered from an attic bedroom; (4) $38,647 was found in plastic bags hidden in a clothes hamper in the master bedroom, the same room where the firearm was discovered between the mattresses; and (5) $330 was discovered on Golden's person. Some of the money was banded in a style that drug dealers often employ. (Testimony of SA Doug Borchert; Testimony of SA Wehrmeyer; Testimony of Task Force Officer ("TFO") Tom Gottas; GVX 2-17.)

6. Both Golden and Motley testified that all of the money found in the house was from legitimate income sources, including rental properties, his employment at Extreme Elements since 2005, and her recent ownership of the Platinum Lounge. (Testimony of Golden and Motley; Stipulation #5.)

7. Golden and Motley testified that they kept the defendant currency in the house because they don't trust banks due to the Child Support Enforcement Agency taking money out of Golden's account without his knowledge. Golden and Motley maintained that they kept money in the house, even though the same house had been "home invaded" the previous December, at which time Golden and Motley were robbed of $5,000. (Doc. # 54, p. 4; Testimony of Golden and Motley; Stipulation #5.)

8. Golden denied selling drugs for the last 20 years, and specifically denied selling any drugs in 2015, or at the Apple Jax Lounge in 2011 (discussed below). He denied receiving $2,400 cash from Mathews on August 1, 2015. (Testimony of Golden; Cross examination of Golden; GVX 94B (deposition testimony of Golden).)

9. Gary Kenst, who testified as a forensic accountant, analyzed tax records belonging to Golden and Motley. Mr. Kenst concluded that there was insufficient reported income on the tax returns provided in discovery to account for amassing $84,367 in the home. The claimants reported losses for rental income except less than $1000 of rental income reported in 2015. Specifically, with regard to Motley, Mr. Kenst concluded that there was an insufficient income stream from her employment and her recent ownership of the Platinum Lounge to account for her claim that 30 percent of the seized currency was from her income or rent receipts. Although Golden had legitimate income, it was insufficient to account for the accumulation of currency in the house, especially considering that the claimants were supporting a family of five and losing money on their rentals, as reported in their income taxes. (Testimony of Gary Kenst; Testimony of Golden; Testimony of Motley; GVX 93 (summary exhibit of claimants' financial and tax documents).)

10. SA Wehrmeyer testified as to the methods of drug dealers in the Northeast Ohio area. He testified regarding: the pricing for cocaine; the methods of selling cocaine; the generation of large amounts of cash; higher level drug dealers' practice of keeping large amounts of cash generated from drug activity out of banks to avoid having a paper trail; and drug dealers' utilization of money counters to keep track of the substantial cash generated by their drug trafficking activities. SA Wehrmeyer identified Golden's voice from two controlled drug buys (discussed below) and interpreted the coded language used during the drug transactions. He also testified that evidence of drug trafficking by Golden was corroborative of the testimony of Mathews. (Testimony of SA Wehrmeyer.)

11. HIDTA officers conducted a controlled purchase of cocaine on November 22, 2011. Utilizing a confidential source, the source purchased 2.5 ounces of cocaine from Golden at the Apple Jax bar in Akron, Ohio for $2,500 cash. During the purchase, Golden departed the Apple Jax in his Ford panel van and went to his home, then located on Glendora Avenue, to retrieve the cocaine. Golden was observed by TFO Michael Yovanna. TFO Yovanna observed Golden arriving at the home and departing from the home shortly thereafter to return to the Apple Jax. The drug deal then took place in the parking lot of the Apple Jax Bar. The drugs were tested and found to be 69.2 grams of cocaine. Golden's voice is captured in recordings of the meeting. (Testimony of SA Wehrmeyer; Testimony of TFO Yovanna; GVX 21-23.)

12. On January 31, 2013, HIDTA officers made a second controlled buy, through a confidential source, of 4.5 ounces of cocaine from Golden for the purchase price of $5,400. This transaction occurred at Golden's previous residence on Glendora Avenue and the drugs provided by Golden were tested and found to be 125.5 grams of cocaine. The buy,

and the call made to set up the buy, were consensually monitored and recorded. Golden's voice is captured in the recordings. Retired TFO Gottas observed the source arrive at the Glendora Avenue home and go into the home where Golden was residing. (Testimony of SA Wehrmeyer; Testimony of retired TFO Gottas; GVX 26-29.)

13. On February 3, 2015, Indiana State Police, as part of an FBI investigation into a large-scale drug trafficking operation, searched Room 211 of the Red Roof Inn located in Greenwood, Indiana. In that room, the police discovered $2,000,000 in United States currency and 19.8 kilograms of cocaine. Much of the currency was wrapped in plastic and duct tape. One large bag of packages of currency had an "Akron" tag on top of it. A fingerprint belonging to Dan Wilson, a charged Akron area drug dealer, was found on the wrappings of the currency. Golden's fingerprint was also found on the wrappings of the currency.

14. Golden admitted that he knows Wilson. Golden denied ever having been in the State of Indiana. Golden testified that he does not know how his fingerprint got on the wrappings for the currency. (Testimony of Aldaberto Martinez; Testimony of Kyle Freeman; GVX 30-33J; GVX 94C (excerpt from deposition of Golden); cross-examination of Golden.)

15. After having the opportunity to carefully evaluate the testimony of claimants regarding their purported reasons why the defendant currency was in their residence, that the defendant currency was earned legitimately, that Golden did not sell drugs, that Golden did not receive cash form Mathews, and that Golden does not know how his fingerprint got on the wrappings of the currency found in Indiana, the Court finds that claimants' testimony lacks credibility. Golden acknowledged that he was evading federal income tax

laws, state child support laws, and state liquor laws, while steadfastly claiming that all of his income sources were legitimate. (Testimony of Golden.) The Court finds it unlikely that claimants' testimony regarding the purported lawful origin of the defendant currency is truthful, given Golden's admission that he was evading a plethora of other laws. In light of the implausibility of claimants' testimony, and the contrary testimony and other evidence presented by the government, the Court holds that the preponderance of the evidence demonstrates that the defendant currency constitutes the proceeds of drug activity.

### III. <u>CONCLUSIONS OF LAW</u>

1. This is an action for civil forfeiture pursuant to 21 U.S.C. § 881(a)(6).

2. The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1345 and 1355, as well as 21 U.S.C. § 881.

3. A federal civil forfeiture action under 21 U.S.C. § 881 is an *in rem* action against the property sought to be forfeited. *United States v. Certain Real Prop. 566 Hendrickson Blvd., Clawson, Oakland Cnty., Mich.*, 986 F.2d 990, 993 (6th Cir. 1993).

4. Title 21, United States Code, Section 881(a)(6) provides in pertinent part:

> (a) Subject property. The following shall be subject to forfeiture to the United States and no property right shall exist in them:
>
> * * *
>
> (6) All moneys . . . furnished or intended to be furnished by any person in exchange for a controlled substance . . . in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys . . . used or intended to be used to facilitate any violation of this subchapter.

5. This *in rem* action is governed by the Supplemental Rules of Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") where applicable, and by the Federal Rules of Civil Procedure, except to the extent they are inconsistent with the Supplemental Rules. *See*, Supplemental Rule A; Fed. R. Civ. P. 1; 28 U.S.C. §§ 1355-1356.

6. The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") applies to all civil forfeiture cases, other than where specifically exempted by statute. 18 U.S.C. §§ 981, 983. CAFRA raised the government's ultimate burden of proof on the merits in a civil forfeiture action from probable cause, subject to rebuttal by a preponderance of the evidence, to a preponderance of the evidence. *See United States v. Melrose E. Subdivision*, 357 F.3d 493, 503 (5th Cir. 2004).

7. The defendant currency is forfeitable as proceeds of drug trafficking under 21 U.S.C. §§ 881(a)(6). The United States has the burden of proof to establish by a preponderance of evidence that the property is subject to forfeiture as proceeds from drug trafficking. 18 U.S.C. § 983(c)(1); *United States v. One TRW; Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 418 (6th Cir. 2006).

8. It is not necessary for the government to demonstrate a direct connection between the defendant property and the illegal activity. 18 U.S.C. § 983(c)(1). *See, e.g. United States v. $118,170 in U.S. Currency*, 69 F. App'x 714, 717 (6th Cir. 2003) (finding that the government sufficiently established that the defendant currency was subject to forfeiture based on evidence of the claimant's insufficient income as a source of seized currency and his history of drug purchases). Instead, "reasonable inferences may be drawn

from the evidence presented to establish a nexus between the property and the drug activity." *United States v. Veggacado*, 37 F. App'x 189, 190 (6th Cir. 2002).

9. The Sixth Circuit has held that there does not need to be direct evidence that the defendant property is traceable to a specific drug offense to show it is proceeds from drug trafficking, as long as reasonable inferences support a connection between the property and drug activity. *See Veggacado*, 37 F. App'x at 190 (holding the government was not required to trace the money that purchased the defendant property to the claimant's underlying criminal conviction); *United States v. $110,873 in U.S. Currency*, No. 1:02CV2107, 2004 WL 2359726, at *3 (N.D. Ohio 2004) (Matia, J.) ("Direct evidence that the money is linked to specific drug sales is not necessary.").

10. An underlying criminal conviction is not required to support the forfeiture of the defendant currency. Although the evidence of an underlying conviction may be considered by the district court, *United States v. Real Prop. Known and Numbered as 415 E. Mitchell Ave., Cincinnati, Ohio,* 149 F.3d 472, 476 (6th Cir. 1998), civil forfeiture proceedings are independent of any criminal conviction. *See U.S. v. $118,170*, 69 F. App'x at 717 ("forfeiture under § 881(a) is not conditioned upon an arrest or conviction for a drug offense") (internal quotations and citation omitted); *United States v. Premises and Real Prop. at 614 Portland Ave.*, 670 F. Supp. 475, 479 (W.D.N.Y. 1987), *aff'd*, 846 F.2d 166 (2d Cir. 1988) ("[a gambling forfeiture statute] is in the tradition of these civil forfeiture statutes and does not require any underlying criminal, *in personam,* conviction").

11. To determine if the defendant property is forfeitable under a drug proceeds theory, courts look to the totality of the circumstances to determine if the defendant currency is proceeds from drug trafficking. *See United States v. $30,670 in U.S. Funds*, 403 F.3d 448,

469 (7th Cir. 2005) (emphasizing the court looks to the totality of the circumstances to determine if the government carried its burden under a drugs proceeds theory).

12. When a large amount of money is found in the home of a suspected drug dealer, courts have held that "[an] extremely large amount of money found in the household itself is strong evidence that the money was furnished or intended to be furnished in return for drugs." *United States v. $93,685.61 in U.S. Currency*, 730 F.2d 571, 572 (9th Cir. 1984). When determining if a particular amount of money qualifies as a "large amount," sister circuits have held that "[w]hile we have never had occasion to consider the minimum amount of cash that may be considered an 'extremely large amount,' the Second Circuit has characterized an amount as low as $2,500 as being 'substantially greater than is commonly kept in residential premises by law-abiding wage earners.'" *United States v. Padilla*, 888 F.2d 642, 644 (9th Cir. 1989) (citing *United States v. $2,500 in United States Currency*, 689 F.2d 10, 16 (2d Cir. 1982)).

13. The government can satisfy its burden of showing funds were traceable to drug-related activity if the claimant's legitimate income was insufficient to account for the amount of money seized. *See United States v. $174,206 in U.S. Currency*, 320 F.3d 658, 662 (6th Cir. 2003); *see also United States v. $34,000 in U.S. Currency*, No. 4:06CV2307, 2007 WL 2710444, *2 (N.D. Ohio Sept. 2007) (Economus, J.) (holding evidence that a drug dealer had recently sold drugs to a confidential source in a controlled buy, in combination with tax returns showing minimal legitimate income for the previous 3 years, was sufficient to show there was no material issue of fact regarding the forfeitability of currency seized from drug dealer's residence).

14. A claimant's criminal (drug) record is a highly probative factor that may be used to establish that currency is subject to federal forfeiture. *See United States v. $67,220 in U.S. Currency*, 957 F.2d 280, 286 (6th Cir. 1992); *United States v. $16,757 in U.S. Currency*, 2013 WL 1405207, *2 (6th Cir. 2013); *United States v. $99,990 in U.S. Currency*, 2003 WL 21698849, *7 (6th Cir. 2003); *United States v. $118 in U.S. Currency*, 2003 WL 21659445, *3 (6th Cir. 2003).

15. The presence of illegal drugs on or near the seized property also shows a nexus between the seized currency and the drug trade. For instance, the presence of marijuana in a vehicle where the currency is found indicates a connection between the money and drug trafficking. *See, e.g., United States v. Cunningham*, 520 F. App'x 413, 415 (6th Cir. 2013) (holding the government carried its burden to prove the defendant currency was subject to forfeiture, as there was marijuana in the vehicle where the currency was found, the claimant had a history of drug trafficking and did not have sufficient legitimate income to account for the currency); *United States v. $311,570.00 in U.S. Currency*, No. 3:12CV1285, 2013 WL 6162989, *6-7 (N.D. Ohio Nov. 22, 2013) (Armstrong, M.J.) (granting the government's motion to strike, as the claimant did not create a dispute of material fact when there was marijuana and a large amount of bundled cash in the vehicle).

16. In addition to the presence of illegal drugs, a money counter found on the scene where the currency was seized can be evidence of one engaging in illegal drug-related behavior. *United States v. Wren*, 528 F. App'x 500 (6th Cir. 2013) (finding that $50,000 in cash, ammunition, a money counter, and vacuum sealer were all relevant in establishing a defendant was associated in a drug conspiracy).

17. Taking into consideration the applicable law and the Court's findings of fact above, the United States has established that, under the totality of the circumstances, the preponderance of the evidence proves that the defendant currency is forfeitable as proceeds of drug trafficking activity by Golden.

18. Under a totality of the circumstances, claimants' financial records and the testimony of Kenst support a finding that the defendant currency was from drug trafficking proceeds rather than from any legitimate source of income of Golden and/or Motley.

19. Under a totality of the circumstances, including the implausibility of claimants' testimony that the defendant currency is legitimately-earned income, Golden and Motley have failed to present any credible evidence that the defendant currency was earned by means other than Golden's drug activity.

## IV. CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law, judgment will be entered in favor of the United States of America, and the defendant $84,367 will be forfeited to the United States for disposition according to law. A judgment consistent with these findings of fact will be issued forthwith.

**IT IS SO ORDERED.**

s/John R. Adams  
JOHN R. ADAMS  
UNITED STATES DISTRICT JUDGE

**DATED**: 6/12/2018